IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NEAL BISSONNETTE<br>and TYLER WOJNAROWSKI<br>on behalf of themselves and all<br>others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>LEPAGE BAKERIES PARK ST., LLC,<br>C.K. SALES CO., LLC, and FLOWERS<br>FOODS, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 3:19-cv-00965-<br>)    KAD |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION

COME NOW Defendants Lepage Bakeries Park Street, LLC ("Lepage"), CK Sales Co.,

LLC ("CK Sales"), and Flowers Foods, Inc. ("Flowers Foods") (collectively, "Defendants"), by

and through undersigned counsel, and submit this Memorandum in Support of Defendants'

Motion to Dismiss or, in the Alternative, to Compel Arbitration.

### I.     Introduction

Plaintiffs Neal Bissonnette and Tyler Wojnarowski ("Plaintiffs") are current independent

distributor franchisees contracted with Defendant CK Sales via corporations they own and

operate, signing a Distributor Agreement in the process.[1]  Under this Distributor Agreement,

Plaintiffs purchased distribution rights to sell and distribute products to customers within a

defined geographic territory.   (Exhibit 1, Declaration of Jake Linthicum (hereinafter cited as

"Linthicum Decl."), ¶ 3 and Attachments 1 and 2 to the same).  Plaintiffs have an equity interest

in their businesses, which can be sold in whole or in part, and are contractually obligated to use

---

[1] CK Sales is a wholly-owned subsidiary of Lepage who, in turn, is a wholly-owned subsidiary of Flowers Foods.  (Dkt. Entry No. 17).

their "Best Efforts" to increase sales in their territories.  (*Id*. at ¶ 8).  Plaintiffs could do this through asking for displays, effective merchandising, soliciting new accounts, and several other things.  (*Id*.)

When signing their Distributor Agreements, each Plaintiff agreed to arbitrate "any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, [or] any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor."  (*Id*. at Attachments 1 and 2, Exhibits K).  They also agreed to waive any right to "INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS IN COURT OR ARBITRATION."  (*Id*.)

In breach of these contractual promises, Plaintiffs filed the instant suit, alleging that they are misclassified as independent contractors, rather than employees, under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA") and Connecticut law.  In further breach of their arbitration agreements, Plaintiffs bring this suit as a putative class and collective action, seeking to represent all other "similarly situated" distributors in Connecticut within the "relevant statutory period."  Ironically, Plaintiffs seek to circumvent their individual arbitration promises despite the fact that their counsel previously touted the benefits of the same to this Court in 2017 – when seeking settlement approval in a suit against Lepage and CK Sales involving Connecticut distributors like Plaintiffs.  **Notably, the arbitration agreement opposing counsel advocated for to this Court is, in all material respects, the very same arbitration agreement they ignore in this case.  And, it is the same arbitration agreement nearly all putative class members Plaintiffs seek to represent also signed, either in connection with that settlement or after the fact if they became distributors after the settlement was finalized.**

In light of the foregoing, Plaintiffs' lawsuit should be dismissed in favor of individual arbitration. Plaintiffs signed binding arbitration agreements containing promises to arbitrate the claims asserted in this lawsuit on an individual basis only. Almost every distributor they seek to represent also signed binding arbitration agreements containing promises to arbitrate the claims Plaintiffs purport to bring on their behalf. These arbitration agreements contain enforceable class and collective action waivers, requiring individual arbitration. Plaintiffs' counsel is well aware of the arbitration requirement as they actually advocated for it in a previous suit. Accordingly, Defendants respectfully request that the Court dismiss this lawsuit pursuant to Fed. R. Civ. P. 12(b)(1) and 9 U.S.C. § 1, *et seq*., or in the alternative, compel individual arbitration.

## II.    Relevant Factual Background

Plaintiffs, who are current independent distributor franchisees, filed this lawsuit on June 20, 2019. (Dkt. Entry No. 1; Linthicum Decl. ¶¶ 6-7). Plaintiffs filed an Amended Complaint on August 19, 2019. (Dkt. Entry No. 24 (hereinafter cited as "Compl.")). They allege that they were misclassified as independent contractors and, as a result, are entitled to relief under the FLSA and Connecticut state law. (Compl. ¶¶ 44-57).

Plaintiff Bissonnette owns Bissonnette Inc., a Connecticut corporation. (Linthicum Decl., Attachment 1, pg. 2). Plaintiff Wojnarowski owns Blue Star Distributors Inc., also a Connecticut corporation. (*Id*. at Attachment 2, pg. 2). Both Bissonnette Inc. and Blue Star Distributors Inc. entered into a Distributor Agreement ("Distributor Agreements") with CK Sales. (*Id*. at Attachments 1 and 2).[2] Under the Distributor Agreements, Bissonnette Inc. and Blue Star Distributors Inc. obtained the exclusive right to sell and distribute products purchased

---

[2] Plaintiffs also signed Personal Guarantees, whereby they personally guaranteed all obligations under the Distributor Agreement. (Linthicum Decl., Attachments 1 and 2, Exhibit F).

from CK Sales to customers in a defined distribution area.  (*Id*. at Attachments 1 and 2, Recitals and Sections 2.4).  Plaintiffs purchase products from CK Sales, which they ultimately resell to their customers for a higher price.  (*Id*. ¶ 9).  The difference between the price at which they sell the products less the price at which they purchase them, less their business expenses, represents Plaintiffs' "profit margin."  (*Id*.)

As distributors, and under the Distributor Agreements they executed, Plaintiffs do not have to perform any services personally but can hire employees to perform all or part of the services for them, can operate outside businesses, and are contractually obligated to increase sales in their territories, which they can do in several ways, including by asking for displays, providing good customer service, recommending new products, and soliciting new accounts, among other things.  (*Id*. ¶ 8).  Because Plaintiffs are compensated based on their sales of products, it is in their best interests to devote necessary time to increasing their sales in their accounts on a daily basis.  (*Id*. ¶ 9).

In connection with the purchase of their distributorship businesses, Plaintiffs entered into arbitration agreements ("Arbitration Agreements"), found as an exhibit to the Distributor Agreements.  (*Id*. at Attachments 1 and 2, Exhibits K (hereinafter cited as "Agreements")).  Each of the Arbitration Agreements contains virtually identical language.  (*Id*.)

A.     **The Arbitration Agreements**

The Arbitration Agreements cover any and all claims pertaining to Plaintiffs' distributorships, explicitly referencing any claims challenging their independent contractor status and claims for compensation.  Specifically, the Arbitration Agreements state:

> The parties agree that any claim, dispute, and/or controversy
> except as specifically excluded herein[3], that either DISTRIBUTOR

---

[3] No applicable exclusions apply.  (Agreements, ¶¶ 8-9).

4

(including its owner or owners) may have against COMPANY (and/or its affiliated companies …) or that COMPANY may have against DISTRIBUTOR … arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY, including … any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any successor rules, except as otherwise agreed to by the parties and/or specified herein.…

…

Covered Claims covered under this Arbitration Agreement include, but are not limited to: breach of contract, any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor, … claims for alleged unpaid compensation, … or statutory penalties under either federal or state law.

(Agreements, ¶¶ 1, 7).

The Arbitration Agreements also require that covered claims must be brought on an individual basis:

All Covered Claims against COMPANY must be brought by DISTRIBUTOR on an individual basis only and not as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. DISTRIBUTOR further agrees that if it is within any such class, collective, representative, or multi-plaintiff action, it will take all steps necessary to opt-out of the action or refrain from opting in or joining, as the case may be, and DISTRIBUTOR expressly waives any right to recover any relief from any such class, collective, representative, or multi-plaintiff action. Similarly, all Covered Claims by COMPANY against DISTRIBUTOR may not be brought as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis, as a private attorney general, or any other representative basis. The parties understand that there are no

bench or jury trials and no class, collective, representative, or multi-plaintiff actions are permitted under this Arbitration Agreement.…

(Agreements, ¶ 3).

Indeed, the Arbitration Agreements emphasize the class and collective action waiver, stating the following, in bold, capital letters:

> **TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICIT[L]Y WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION; (2) SERVE OR PARTICIPATE AS A REPRESENTATIVE OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; (3) SERVE OR PARTICIPATE AS A MEMBER OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; OR (4) RECOVER ANY RELIEF FROM ANY SUCH CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF ACTION.**

(Agreements, ¶ 4).

The Arbitration Agreements are clear that "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement (except for those concerning the validity or enforceability of the prohibition against class, collective, representative, or multi-plaintiff action arbitration and/or applicability of the FAA) shall be resolved by the arbitrator, not a court." (Agreements, ¶ 5). When signing the Arbitration Agreements, Plaintiffs acknowledged: (1) "…**this is an important document that affects its legal rights and that the DISTRIBUTOR has been given the opportunity to discuss this Arbitration Agreement with private legal counsel"**; and (2) he **"understands that this Arbitration Agreement requires that disputes that involve matters subject to the Agreement be submitted to arbitration pursuant to the Arbitration Agreement rather than to a judge or jury in court and that**

such disputes must be brought on an individual basis only." (Agreements, ¶¶ 12, 14) (emphasis in original).

Under the Arbitration Agreements, the Company agreed to pay for all filing fees and costs typically associated with American Arbitration Association ("AAA") arbitration, subject to the arbitrator's ability to award the Company costs and fees as the prevailing party. (Agreements, ¶ 2). Further, both the agreement to arbitrate covered claims and the class/collective action waiver are mutual, the arbitration is conducted by a neutral arbitrator, and the arbitrator has the authority to award the same damages and other relief that would have been available in court under applicable law, including attorneys' fees and costs. (Agreements, ¶¶ 1-3). The Arbitration Agreements state that they "shall be governed by the FAA and Connecticut law to the extent Connecticut law is not inconsistent with the FAA." (Agreements, ¶ 13) (emphasis in original).

### B.      Opposing Counsel's Involvement in the Arbitration Agreements

In 2017, Plaintiffs' counsel settled a putative class action lawsuit in this Court against Defendants Lepage and CK Sales on behalf of Connecticut-based distributors. (*Bokanoski et al. v. Legpage Bakeries Park St., LLC et al.*, Civil Action No. 3:15-cv-00021-JCH). To facilitate the prior settlement, Plaintiffs' counsel made repeated representations to this Court that contradict their current suit, including advocating for the arbitration promise they now flout. For example, opposing counsel described the ADR program involving arbitration as giving distributors "**the right to effectively resolve disputes moving forward in a very efficient manner**" and as "**more convenient and cost-effective**." (*Bokanoski*, Dkt. Entry No. 125, pp. 2, 11) (emphasis added).

In connection with the *Bokanoski* settlement, multiple Connecticut distributors signed the arbitration agreement advocated by Plaintiffs' counsel in exchange for valuable consideration and chose to continue to operate their businesses.[4]   (Linthicum Decl. ¶¶ 11, 14).   Since the *Bokanoski* settlement, new distributors who have purchased territories from the company have likewise executed this same Arbitration Agreement.   (*Id*. at ¶ 12).   Distributors who purchased territories from existing distributors are likewise subject to this Arbitration Agreement given their execution of an assumption agreement when they purchased the distributorship, under which they agreed to assume all obligations associated with the newly-purchased distributorship, including the Arbitration Agreement.   (*Id*. at ¶ 13).   Despite formerly praising arbitration as a cost-effective means for dispute resolution, Plaintiffs' counsel filed the instant suit without even disclosing the existence of the Arbitration Agreements.   However, this case is subject to individual arbitration – an efficient and cost-effective process as Plaintiffs' counsel previously acknowledged.

### III.    Argument and Authorities

The Federal Arbitration Act ("FAA") pronounces a liberal policy favoring enforcement of arbitration agreements.  9 U.S.C. § 1, *et seq*.; *AT&T Mobility, LLC v. Conception*, 131 S. Ct.

---

[4] Other distributors elected to sell their businesses in connection with the settlement and release or were former distributors at the time of settlement and release and are, therefore, not putative class members.  (Compl. ¶ 4).  However, as set forth in the attached declaration of Jake Linthicum, two of the putative class members are not subject to an arbitration agreement. (Linthicum Decl. ¶ 15).

1740, 1745 (2011).[5]   Under the FAA, "a written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Section 4 of the FAA specifically provides for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement.   9 U.S.C. § 4; *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991).  As the Second Circuit Court of Appeals has explained, "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we 'have often and emphatically applied.'"  *Arciniaga v. General Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) (quoting *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 24 (2d Cir. 1995)).

In adjudicating motions to compel under the FAA, "the Court must examine '(1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement.'"  *Considine v. Brookdale Senior Living, Inc.*, 124 F. Supp. 3d 83, 88 (D. Conn. 2015) (quoting *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002)).[6]   As discussed below, each element is satisfied,

---

[5] Even prior to *Conception*, the Supreme Court previously confirmed this liberal policy favoring arbitration in several other decisions.  *See, e.g., Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *accord Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983).  The FAA governs all contracts "involving commerce," subject only to a narrow exception for the employment contracts of transportation workers contained in Section 1.  9 U.S.C. §§ 1-2; *Circuit City Stores v. Adams*, 532 U.S. 105, 119 (2001).  As discussed below in Section III, D, this exception, which is explicitly narrower than the broad parameters of Section 2 coverage, is inapplicable.

[6] Connecticut District Courts also examine whether the suit involves federal statutory claims that are non-arbitrable.  *Morales v. Rent-A-Ctr., Inc.*, 306 F. Supp. 2d 175, 179 (D. Conn. 2003).

rendering arbitration the only appropriate forum for Plaintiffs to pursue their claims on an individual basis only.

### A. Plaintiffs Agreed to Arbitration and Their Counsel Praised the Very Arbitration Agreements They Now Ignore.

To determine whether the parties agreed to arbitrate a given dispute, ordinary principles of state contract formation law apply. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Morales*, 306 F. Supp. 2d at 180. Under the parties' contractual choice-of-law provision in the Distributor Agreements, Connecticut law applies. (Distributor Agreements, ¶ 20.11). Likewise, the Arbitration Agreements provide that Connecticut law applies to the extent not inconsistent with the FAA. (Agreements, ¶ 13). Plaintiffs bear the burden of establishing that such Arbitration Agreements are inapplicable or invalid. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

Connecticut law requires a meeting of the minds and consideration to form a valid contract. *Deleon v. Dollar Tree Stores, Inc.*, No. 3:16-CV-00767 (CSH), 2017 WL 396535, at *2 (D. Conn. Jan. 30, 2017) (citations omitted). When a litigant actually signs the arbitration agreement at issue, this "serves as presumptive evidence that an agreement was formed." *Morales*, 306 F. Supp. 2d at 181 (citations omitted).

In this case, there is no question that the parties agreed to arbitration. The Arbitration Agreements are clear, unambiguous, and provided Plaintiffs with ample and prominent notice of their rights. Plaintiffs each made an informed decision to sign the Arbitration Agreements, after being explicitly advised that it affected their legal rights and that they may want to consult a lawyer. Plaintiffs' signatures alone are conclusive evidence of contract formation. *D'Antuono v.*

---

However, the federal statutory claim asserted here under the FLSA is plainly arbitrable, satisfying this inquiry. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018).

*Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 323 (D. Conn. 2011) ("In Connecticut, the fact that a party signed a written agreement is usually conclusive evidence of contract formation."). Moreover, the Arbitration Agreements are supported by adequate consideration under Connecticut law, including, but not limited to, the mutuality of the obligation to arbitrate disputes. *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 767, n.2 (D. Conn. 1996) (citing *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 411 (2d Cir. 1959)) ("Mutual promises to arbitrate are sufficient to support an arbitration agreement.").

Not only did Plaintiffs clearly agree to arbitration through a written, binding, and enforceable agreement, but their counsel actually advocated for the same on behalf of Connecticut distributors in 2017. As set forth above, in order to obtain approval from this Court to settle the *Bokanoski* lawsuit, Plaintiffs' counsel made repeated representations to this Court about the benefits of arbitration for distributors. (*Bokanoski*, Dkt. Entry No. 125, pp. 2, 11). Moreover, they actually negotiated for an arbitration agreement, which is virtually identical to the Arbitration Agreements Plaintiffs signed. (*Bokansoki*, Dkt. Entry No. 116-2; Agreements). Any attempt to disavow an agreement they praised to this Court should not be permitted.[7]

---

[7] To avoid this result, Plaintiffs will predictably argue that the Supreme Court's 2019 decision in *New Prime Inc. v. Oliveira* provided a new avenue to avoid the arbitration agreement their counsel previously lauded. Specifically, Plaintiffs will argue that they are "transportation workers" and are thus exempt from the FAA under § 1 – an exemption discussed in *New Prime*. However, the FAA was enacted in 1925 – nearly 100 years ago. Since that time, numerous litigants have argued, and courts have discussed, § 1 and its exemption. The 2019 *New Prime* decision did not create a new legal avenue unknown to courts or experienced counsel like Lichten & Liss-Riordan since their 2017 representations, it simply clarified certain issues under § 1. In fact, opposing counsel argued the § 1 exemption in an effort to avoid arbitration on behalf of delivery drivers in 2015 – well before the *Bokanoski* settlement or the *New Prime* decision. *See Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1152 (N.D. Cal. 2015). Any attempt to renounce their previous representations about arbitration to this Court on the basis of *New Prime* is meritless. Regardless, as discussed below in Section 3, D, Plaintiffs do not fall within § 1's narrow exemption and the FAA's arbitration mandate is, therefore, applicable.

**B.      Plaintiffs' Claims Fall Within the Scope of the Agreements.**

The second inquiry considers whether the dispute in question falls within the scope of the Arbitration Agreements.  *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (citation omitted).   "[A]ny doubts concerning the scope of an agreement to arbitrate 'should be resolved in favor of arbitration'" and courts are required 'to construe arbitration clauses as broadly as possible.'"  *Deleon*, 2017 WL 396535, at *2 (citing *Am. Express*, 672 F. 3d at 128).

Here, the inquiry is a simple one:  Plaintiffs' misclassification claims under state and federal law are expressly covered by the Arbitration Agreements, which require individual "binding arbitration" for "[a]ll claims, disputes, and controversies arising out of or in any manner relating to" their Distributor Agreements, including "any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor . . . and claims for alleged unpaid compensation . . . under either federal or state law."  (Agreements, ¶¶ 1, 7).  Therefore, there can be no question the claims asserted in this lawsuit are covered by the Arbitration Agreements.

The Court, however, should not even reach this conclusion because the parties clearly and unmistakably delegated issues of arbitrability, including scope, to the arbitrator.   In the Second Circuit and under Connecticut law, when parties clearly evidence an intent to delegate issues of arbitrability to the arbitrator, the arbitrator (and not the Court) must decide the same. *Deleon*, 2017 WL 396535, at *5 (citations omitted).  Parties may delegate issues of arbitrability – including whether an arbitration clause applies to a particular controversy – to the arbitrator either expressly or by incorporation of arbitration rules so providing.  *Saizhang Guan v. Uber*

*Techs., Inc.*, 236 F. Supp. 3d 711, 727 (E.D.N.Y. 2017); *Considine*, 124 F. Supp. 3d at 90-91. Issues of arbitrability include disputes on the scope of the arbitration agreement. *Considine*, 124 F. Supp. 3d at 89 (explaining, "Because the parties' dispute focuses on the scope of the arbitration agreement, it is squarely one of arbitrability.").

In this case, the Arbitration Agreements provide that, with the exception of the class action waiver, "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement … shall be resolved by the arbitrator" – evidencing the parties' express agreement to delegate issues of arbitrability. (Agreements, ¶ 5); *Considine*, 124 F. Supp. 3d at 90 (collecting cases on express delegation). Further, the Arbitration Agreements state that any arbitration will be held "in conformity with the Commercial Arbitration Rules of the American Arbitration Association." (Agreements, ¶ 1). The AAA's Commercial Rule 7 provides that "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Via incorporation of the AAA's rules, including Rule 7, the parties clearly and unmistakably delegated questions of arbitrability, including scope, to the arbitrator. *See Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (affirming holding that arbitrator would decide questions of arbitrability where parties' agreement stated that arbitration shall be held in accordance with the AAA's Commercial Arbitration Rules, stating: "We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.").

**C.** **Under *Epic Systems*, Plaintiffs' Claims Must be Resolved on an Individual Basis in Arbitration.**

Plaintiffs' claims are subject to individual arbitration under the FAA. Here, the Arbitration Agreements are not silent on class arbitration. They provide:

> The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis ….
>
> **TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICIT[L]Y WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION ….**

(Agreements ¶¶ 3, 4) (emphasis in original). Pursuant to the plain terms of the Arbitration Agreements, the parties clearly agreed that any claims brought by Plaintiffs must proceed to arbitration on an individual basis.

The Supreme Court considered and resolved the issue of the enforceability of class action waivers in arbitration agreements last year. *Epic Sys.*, 138 S. Ct. 1612. *Epic Systems* was a consolidation of actions from the Fifth, Seventh, and Ninth Circuits where employees who signed arbitration agreements containing class actions waivers brought putative collective actions under the FLSA – and in two instances an accompanying state law class action – against their employers seeking allegedly unpaid wages. *Id.* at 1612. Rejecting that effort, the Supreme Court held that Congress, when it enacted the FAA, was "instruct[ing] federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Id.* at 1619.

14

Just as in *Epic Systems*,[8] these Plaintiffs – after given ample opportunity to decide – signed Arbitration Agreements where they agreed in exchange for valuable consideration to waive their rights to pursue their claims in court, or on a class or collective basis.  And, just as in *Epic Systems*, these Plaintiffs improperly ignored their contractual obligations in seeking to collectively pursue these claims.  Under *Epic Systems*, Plaintiffs are bound to resolve this dispute on an individualized basis, as their Arbitration Agreements provide, and this Court should likewise abide by the liberal policy favoring enforcement of arbitration agreements and enforce them as written.

**D.**     **Plaintiffs Do Not Fit Into the Narrow "Transportation Workers" Exemption Found in § 1 of the FAA.**

**1.**     **The Narrow Transportation Workers Exemption is Inapplicable.**

Despite the clear language of the Arbitration Agreements they signed, Plaintiffs will inevitably argue that their claims should not be compelled to arbitration because they are "transportation workers" exempt from the FAA under § 1.  But, this argument lacks merit.

Section 1 of the FAA excludes coverage for "contracts of employment of seaman, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  Plaintiffs are obviously not railroad employees or seamen.  Rather, they will likely try to squeeze within the so-called "residual" clause for "any other class of workers engaged in foreign or interstate commerce."  It is Plaintiffs' burden to prove that the FAA does not apply.

---

[8] While Defendants, of course, do not concede that Plaintiffs or those they seek to represent are employees, Plaintiffs are contending that they were misclassified and should be employees. As discussed above, misclassification claims are clearly covered within the scope of the Arbitration Agreements. Further, since *Epic Systems*, courts have found that its reasoning also applies to arbitration agreements within independent contractors.  *See, e.g., McGrew v. VCG Holding Corp.,* 735 F. App'x 210 (6th Cir. 2018).

*Gilmer*, 500 U.S. at 35.  And, as set forth below, the residual clause is inapplicable, rendering enforcement of the Arbitration Agreements appropriate under the FAA.

The Supreme Court "narrowly interpreted" the FAA's residual clause.  *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 482 (S.D.N.Y. 2008) (citing *Circuit City v. Adams*, 532 U.S. 105, 115 (2001)).  Even prior to the Supreme Court's direction, the Second Circuit likewise narrowly construed the same, adopting the majority position.  *Id*. at 481.  To fall within the exemption, an individual must be within a class of transportation workers employed in the transportation industry.  *Id*. at 481; *Circuit City*, 532 U.S. at 119; *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005) ("it is apparent Congress was concerned only with giving the arbitration exemption to 'classes' of transportation workers within the transportation industry.").  Plaintiffs – who are not members of a class of transportation workers in the transportation industry – cannot make their required showing.

> **a)    Plaintiffs Do Not Work in the Transportation Industry Such As Railroad, a Maritime Shipping Company, or a Trucking Company.**

To be a transportation worker, the individual must first be employed in the transportation industry.  *Adams v. Suozzi*, 433 F.3d 220, 226 (2d Cir. 2005); *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 982 (2d Cir. 1997); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069, n1 (2d Cir. 1972).  That is not the case here.  Indeed, "[t]he Second Circuit has consistently viewed the exclusion clause in § 1 narrowly, holding it applies 'only to those actually in the transportation industry.'"  *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 765, n.1 (D. Conn. 1996) (quoting *Erving*, 468 F.2d at 1069).  This requires "being a member of an industry that primarily involves the actual, physical movement of goods through interstate commerce."  *Kowalewski*, 590 F. Supp. at 484 (citation omitted).  For example, this Court

16

concluded that the § 1 residual clause did not apply to a Vice President of an apparel manufacturer because, under the "narrow" clause, it applies only to those *in the transportation industry*. *Topf*, 942 F. Supp. at 765, n.1

Other courts have sought to determine the true nature of what it means to work in the transportation industry, interpreting it narrowly. Two cases, both of which were cited by the Southern District of New York in *Kowalewski*, are worth noting. The first is *Hill v. Rent-A-Ctr., Inc.*, in which the Eleventh Circuit found that Rent-A-Center – a business that sells furniture and appliances to customers on a rent-to-own basis – was not in the transportation industry. 398 F.3d 1286, 1288-90. Instead, the court unsurprisingly found that Rent-A-Center was in the business of selling furniture – despite the fact that their business dealings caused employees to cross state lines. *Id*. As such, plaintiff "was not within the class of workers within the transportation industry." *Id*.

The second case is *Tran v. Texan Lincoln Mercury, Inc.* No. CIV.A. H-07-1815, 2007 WL 2471616 (S.D. Tex. Aug. 29, 2007). In it, the Southern District of Texas provided perhaps the most cogent analysis of the issue, stating that "a transportation worker is someone who works in the transportation industry—an industry whose mission it is to move goods." *Id*. at *5. In contrast, the court explained that "[Plaintiff] worked in the automobile industry—an industry whose mission it is to manufacture and sell automobiles …. His duties were not to transport goods on behalf of a carrier like a railroad or a vessel like a ship." *Id*.

Under this reasoning, Defendants are simply not transportation companies. Indeed, they are not common carriers like a railroad or over-the-road trucking companies. Rather, CK Sales, with whom Plaintiffs contracted, is in the business of contracting with distributors and Lepage is

in the business of manufacturing bread and bakery products.[9]  (Linthicum Decl. ¶ 2).  Lepage – like every other business – needs to get their products to customers, and one of the primary channels used by them to distribute bakery products is a network of independent distributors who contract with CK Sales to operate their own franchise businesses.  *Id.*  As with most businesses, Lepage's transportation function is incidental to the overall business.  Plaintiffs do not – and cannot – claim Defendants are in the business of merely transporting goods like a trucking company, a railroad, or a fleet of ships, such that their alleged employment occurred in the transportation industry.  Thus, they are not within a class of workers in the transportation industry and the residual clause does not apply.

> **b)   Plaintiffs Are Not Transportation Workers Because Their Delivery of Goods[10] is Incidental to Their Overall Business Duties.**

Even if Defendants were members of the transportation industry (and they are not), Plaintiffs cannot show that they, themselves, belong to a class of transportation workers.  Much like a transportation company must be primarily focused on the movement of goods in interstate commerce to satisfy prong one, a transportation worker must be primarily focused on moving goods in interstate commerce within the meaning of the § 1 exemption.  *Kowalewski*, 590 F. Supp. 2d at 485 (rejecting plaintiffs' effort to "extend the scope of the residual exemption to any 'transportation worker' who crosses state lines, as long as the worker is transporting goods or people and citing *Hill*, 398 F. 3d at 1289 ("The emphasis [of *Circuit City*] … was on a class of

---

[9] Neither can it be claimed that Defendant Flowers Foods is a transportation company.  Flowers Foods is the parent holding company of numerous operating subsidiaries, which produce fresh breads, buns, rolls, and snack cakes.  (Linthicum Decl. ¶ 2).

[10] The goods ordered, sold, and delivered by Plaintiffs do originate from other states, and if any is ultimately determined to be an employee, he would be exempt from the overtime provisions of the FLSA pursuant to the Motor Carrier Act exemption.

workers in the transportation industry, rather than on workers who incidentally transported goods interstate as part of their job …").

The key inquiry is whether the workers are "*engaged* in … interstate commerce." 9 U.S.C. § 1. This is a far more demanding test than, for example, § 2 of the FAA which governs its general applicability and uses the broader formulation: "contract evidencing a transaction *involving* commerce." *Id*. at § 2; *Kowalewski*, 590 F. Supp. 2d at 481, n. 2. The Supreme Court has ruled that this difference reflects a deliberate difference:  while § 2's use of "the word 'involving . . . signals an intent to exercise Congress' commerce power to the full" the words "engaged in commerce" in § 1 "have a more limited reach."  *Circuit City*, 532 U.S. at 115. Under § 1, it is not enough to be in some attenuated sense involved in the flow of interstate commerce; instead, it applies to those "'in, or closely related to the actual movement of goods in interstate commerce.'"  *Kowalewski*, 590 F. Supp.2d at 481 (internal quotation omitted).  Indeed, "the reference to 'seaman, railroad employees, or any other class of workers engaged in foreign or interstate commerce,' suggests that Congress intended to refer to workers engaged in commerce in the same way that seaman and railroad workers are."  *Powers v. Fox Television Stations, Inc.*, 923 F. Supp. 21, 23 (S.D.N.Y. 1996) (quoting *DiCrisci v. Lyndon Guar. Bank of New York*, 807 F. Supp. 947, 953 (W.D.N.Y. 1992)); *See also Circuit City*, 532 U.S. at 114-115 (explaining that residual clause is "read to give effect to the terms 'seaman' and 'railroad employees' and should itself by controlled and defined by reference to the enumerated categories of workers which are recited just before it.").

To be a transportation worker within the narrow meaning of § 1 of the FAA, then, the movement of goods in interstate commerce must be the primary job duty.  *Kowalewski*, 590 F. Supp. 2d at 483 ("The extant case law is harmonious with the proposition that the interstate

shipment of physical goods is central to the analysis, given, for example, the consensus among

courts that truck drivers—workers *dedicated to* the interstate shipment of physical goods—fall

within the narrow residuary exemption.") (emphasis added).   For example, in *Veliz v. Cintas

Corp.*, another case cited by the Southern District of New York in *Kowalewski*, the court found

that workers who performed many of the same duties as Plaintiffs were <u>not</u> transportation

workers.   No. C 03-1180 SBA, 2004 WL 2452851, at *8 (N.D. Cal. Apr. 5, 2004), *modified on

reconsideration*, No. 03-01180(SBA), 2005 WL 1048699 (N.D. Cal. May 4, 2005).   There, Sales

Service Representatives ("SSRs") drove from customer to customer delivering and picking up

product, restocking supplies, and receiving orders or facilitating sales for more supplies.   *Id*.   The

District Court held:

> While SSRs deliver goods, they also perform customer service
> functions. They note supply levels at different customer sites and
> re-stock those supplies. They pick-up used or dirty products such
> as uniforms and mats and replace them with new ones. These job
> duties certainly entail driving. They do not, however, entail
> delivery of product in the same manner that a truck driver does.
> The primary duty of SSRs is more akin to customer service than it
> is to a warehouse trucker, railroad employee or seamen.
> Accordingly, based on the evidence at hand, SSRs are not
> transportation workers within the meaning of the FAA exemption.

*Id*. at *10.

Here, Plaintiffs own and manage distribution businesses, the cornerstone of which is

distribution rights to various bakery products in a defined geographical area.   Plaintiffs purchase

bakery products from CK Sales and sell those products to customers in such territories.

(Linthicum Decl. ¶ 9).   Plaintiffs are responsible for operating their own businesses, including

hiring employees at their discretion to run their businesses; identifying and engaging potential

new customers; developing relationships with key customer contacts; determining and ordering

product based on customer needs; servicing the customers in their territory; stocking and

replenishing product at the customer locations;   removing stale product; and other activity necessary to promote sales, customer service, and otherwise operate their businesses.  (*Id*. at ¶ 8). The businesses can appreciate in value and can be sold for a profit.  *Id*.  As such, Plaintiffs are not transportation workers in any reasonable sense, let alone as contemplated by § 1.

Exempting Plaintiffs here would flout the FAA's history and purpose.  Unlike workers engaged in long-distance transportation, local distribution franchise businesses do not resemble § 1's exemption for "enumerated categories of workers" – i.e., seamen and railroad employees – which, again, "control[]" and help to "define[]" the scope of the residual clause.  *Circuit City*, 532 U.S. at 115.  The "exemption was intended to reach workers who would, by virtue of a strike, interrupt the free flow of goods to third parties in the same way that a seamen's strike or railroad employee's strike would."  *Vargas v Delivery Outsourcing, LLC*, No. 15-03408, 2016 WL 946112, *3 (N.D. Ca. Mar. 14, 2016) (citation omitted).  Plaintiffs have no more power to do that than any other workers that make important contributions to a retail enterprise, such as "cashiers" and "shelf-stockers."  *Lee v. Postmates Inc.*, No. 18-03421, 2018 WL 6605659, at *7, *7 (N.D. Cal. Dec. 17, 2018); *see also Vargas*, 2016 WL 946112, at *5.

Indeed, while the FAA exemption for railroad employees and seaman "was motivated by a desire not to upset pre-existing or developing statutory schemes in those areas," *no such framework applies to Plaintiffs*.  *Kowalewski*, 590 F.Supp.2d at 485 (explaining that its rejection of the § 1 exemption was in accord with the Supreme Court's decision in *Circuit City* where "there is no suggestion that applying the FAA [to this case] … would upset any pre-existing or developing statutory scheme.").  Moreover, as the Second Circuit has explained, though the legislative history of § 1 is "vague and inconclusive," it "apparently was inserted at the request of the Seaman's Union, which felt that disputes involving the contracts of seaman came within

the admiralty jurisdiction and should not be subject to arbitration." *Signal-Stat Corp. v. Local 475, United Elec. Radio & Mach. Workers of Am.*, 235 F.2d 298, 302 (2d Cir. 1956), *overruled on other grounds by Coca-Cola Bottling Co. of New York v. Soft Drink & Brewery Workers Union Local 812 Int'l Bhd. of Teamsters*, 242 F.3d 52 (2d Cir. 2001).  Again, no such issue exists with respect to local franchise business owners, like Plaintiffs.[11]

Simply put, Plaintiffs are a far cry from traditional transportation workers like a long-haul trucker, railroad worker, or seaman who principally deliver goods in interstate commerce for employers in the transportation industry.  They are more akin to sales workers or managers who are generally responsible for all aspects of a bakery products distribution business.  Therefore, even assuming *arguendo*, Plaintiffs work in the transportation industry, they are still not transportation workers and do not fit into the narrow § 1 exemption.

        **c)**       **Plaintiffs Are Not Engaged in Interstate Commerce under the FAA Because Their Incidental Deliveries Are Purely Intrastate.**

In addition to the foregoing, § 1 does not apply here because Plaintiffs admit that they deliver goods within a single state (Connecticut).  (Compl. ¶¶ 2-3, 14, 18; *See also* Linthicum Decl. ¶ 10).

The § 1 exemption applies to "transportation workers" like seamen and railroad employees engaged in foreign or interstate deliveries; and any other exempt workers must be

---

[11] Indeed, as set forth above, § 1 of the FAA is, by its very terms, extremely narrow, focusing on the nature of the workers' specific activities.  More specifically, in *Circuit City,* the Supreme Court rejected the notion that § 1 exempts all contracts of employment from the FAA, "whether or not the worker is engaged in transportation." 532 U.S. at 109.  In fact, when looking at § 2 coverage of the FAA, it becomes even more clear that Congress did not intend to expand § 1. Section 2, for example, provides that the FAA should apply to arbitration provisions "in any maritime transaction or contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Section 1, on the other hand, is much narrower – limiting application to individuals "engaged in foreign or interstate commerce."  9 U.S.C. § 1.

defined in light of the narrowness of these two categories. *Circuit City*, 532 U.S. at 115-118.

Not surprisingly, then, subsequent cases have construed § 1 to apply only to transportation

workers whose duties include interstate deliveries – i.e., actual crossing of state lines. *See Levin*

*v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1154 (N.D. Cal. 2015) ("a number of courts have held that

local delivery drivers do not fall within the transportation exemption to the FAA."); *See also*

*Bonner v. Mich. Logistics, Inc.*, 250 F.Supp.3d 388, 396-97 (D. Ariz. 2017) (citation omitted)

(emphasis added) (finding the FAA applied to delivery drivers and explaining that § 1 is "meant

to exclude the contracts of workers *who are literally engaged in the process of moving goods*

*across state and national boundaries—workers like seamen and railroad employees*."); *Vargas*

*v. Delivery Outsourcing, LLC*, No. 15-CV-03408-JST, 2016 WL 946112, at *5 (N.D. Cal. Mar.

14, 2016) (rejecting § 1 challenge and applying the FAA to intrastate delivery of luggage, despite

plaintiff's argument that there is "continuity of movement" between the interstate travel of the

luggage and Plaintiff's purely intrastate deliveries); *Lee v. Postmates Inc.*, No. 18-CV-03421-

JCS, 2018 WL 4961802, at *8 (N.D. Cal. Oct. 15, 2018), *motion to certify appeal granted*, No.

18-CV-03421-JCS, 2019 WL 1864442 (N.D. Cal. Apr. 25, 2019) (rejecting § 1 challenge and

applying the FAA to local delivery driver, even though deliveries may include goods that were

manufactured out of state); *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 899 (N.D. Cal.

2018), *appeal filed* November 20, 2018 (rejecting § 1 challenge and finding that because delivery

driver did not allege he crossed state lines as part of his work "there is no allegation that he

engaged in interstate commerce under the definition of the narrowly-construed term."); *Wallace*

*v. Grubhub Holdings Inc.*, No. 18 C 4538, 2019 WL 1399986, at *4 (N.D. Ill. Mar. 28, 2019)

(rejecting § 1 challenge and applying the FAA to local delivery driver where delivery involved

purely intrastate sales and finding that delivery drivers were not similar to enumerated categories of seaman and railroad employees).[12]

Here, Plaintiffs, admittedly, did not cross state lines while delivering the products they sell to customers within the State of Connecticut.  (Compl. ¶¶ 2-3, 14, 18).  Therefore, the residual clause of the FAA is not properly applied.  *See, e.g., Int'l. Bro. Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 955-958 (7th Cir. 2012) (applying § 1 exemption to trucker who crossed state lines occasionally and suggesting that a trucker who failed to cross state lines would not be a transportation worker under § 1).  This finding is, again, in accord with the notion that Congress intended § 1 to apply to workers who, by virtue of a strike, would "interrupt the free flow of goods to third parties *in the same way that a seamen's strike or railroad employee's strike would*."  *Veliz*, 2004 WL 2452851, at *8-10 (emphasis added).  Here, of course, a strike by Plaintiffs making local deliveries of baked goods within a single state simply would not have the same broad impact as that of a strike by the enumerated categories of workers, i.e., railroad employees or seaman, which define and control the residual clause.  *See Lee*, 2018 WL 6605659, at *7 ("A strike by local couriers would presumably have no more effect on interstate commerce than a national strike of, say, cashiers, shelf-stockers, or any number of

---

[12] While there is some authority for the proposition that a plaintiff need not deliver goods across state lines for § 1 to apply, these cases are readily distinguishable and not persuasive.  At present, the Second Circuit has not issued a decision addressing the issue.  However, one district court in the circuit has noted, via a footnote, that delivery drivers contracted with a third-party logistics company were engaged in interstate commerce under the FAA, though they did not actually cross states lines.  *Diaz v. Michigan Logistics Inc.*, 167 F. Supp. 3d 375, 381, n.3 (E.D.N.Y. 2016).  However, unlike here, the *Diaz* plaintiffs were engaged primarily to transport auto parts, which was the "heart of Defendant's business."  *Id*.  In this case, while Plaintiffs certainly deliver products they sell to customers through their business, such delivery is incidental to the operation of their franchisee businesses (i.e., sale of bakery products to customers) and is not the heart of CK Sales', Lepage's, or Flowers Foods' businesses.  Therefore, this footnote is inapposite.

other classes of employees who are not interstate transportation workers."). As a result, enforcement of the Arbitration Agreements under the FAA is appropriate.

> **2.    Even if Plaintiffs Fit Within the FAA's "Narrow" Transportation Worker Exemption, the Arbitration Agreement is Still Enforceable Under State Law.**

Even if the transportation workers exemption applies to Plaintiffs, making the FAA inapplicable, that would not end the analysis. Rather, if the FAA does not apply, state arbitration law governs. *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 24 (1st Cir. 2017) (emphasizing that the § 1 exemption "applie[d] only when arbitration is sought under the FAA, and it has no impact on other avenues (such as state law) by which a party may compel arbitration"); *See also Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 529 (S.D.N.Y. 2003) (citations omitted) (adopting "weight of authority" that state law will apply to contracts not covered by the FAA and explaining that the opposite position "flouts" arbitration policy, "departs from clear authority," and "most importantly … essentially rewrites what is merely an exemption providing that the FAA does not apply to a substantive pronouncement that such clauses in transportation workers' contracts are unenforceable."). This conclusion has been reached more recently by courts within and outside the Second Circuit. *See Michel v. Parts Auth., Inc.*, No. 15CV5730ARRMDG, 2016 WL 5372797, at *3 (E.D.N.Y. Sept. 26, 2016); *Burgos v. Ne. Logistics, Inc.,* No. 15CV6840CBACLP, 2017 WL 10187756, at *4 (E.D.N.Y. Mar. 30, 2017); *Merrill v. Pathway Leasing LLC*, No. 16-CV-02242-KLM, 2019 WL 1915597, at *5 (D. Colo. Apr. 29, 2019); *Colon v. Strategic Delivery Sols., LLC*, 459 N.J. Super. 349, 360, 210 A.3d 932, 939 (App. Div. 2019). Therefore, this Court should still compel arbitration under Connecticut state law.

Connecticut law accords with the FAA and its liberal policy favoring arbitration. *Nussbaum v. Kimberly Timbers, Ltd.*, 856 A. 2d 364, 368 (Conn. 2004) ("Connecticut has

adopted a clear public policy in favor of arbitrating disputes.").  Under Conn. Gen. Stat. § 52-408, "An agreement in any written contract … to settle by arbitration any controversy thereafter arising out of such contract … shall be valid, irrevocable and enforceable, except where there exists sufficient cause at law or in equity for the avoidance of written contracts generally."  Here, consistent with the Connecticut arbitration statute, the Arbitration Agreements are in writing.  In addition, as set forth above, the parties' Arbitration Agreements were properly formed under Connecticut law through mutual assent and consideration.  (*See supra* Section III, A).  Therefore, this Court must still compel arbitration under applicable state law, in the event the FAA is determined to be inapplicable.

> **E.     The Court Should Dismiss Plaintiffs' Claims and Compel Individual Arbitration.**

Courts uniformly emphasize the strong federal and state policy favoring arbitration – and there is no reason to deviate from that policy in this case.  Plaintiffs entered into valid Arbitration Agreements which apply to all claims they seek to assert against Defendants.  Thus, the Court should order the parties to proceed with individual arbitration as required by the FAA or, alternatively, state law.  9 U.S.C. § 3; *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 218 (1985) (The FAA "requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel"); *MSO, LLC v. DeSimone*, 313 Conn. 54, 63, 94 A.3d 1189, 1195 (2014) (quoting *Gores v. Rosenthal*, 150 Conn. 554, 557, 192 A.2d 210 (1963)) ("When parties have a valid arbitration agreement, 'the courts are empowered to direct compliance with its provisions.'").

Defendants also request dismissal of Plaintiffs' claims.  "Although Section 3 of the FAA only speaks of staying proceedings, it is well-settled that an arbitrable dispute may be dismissed in lieu of a stay if the defendant requests dismissal."  *Nicosia v. Amazon.com, Inc.*, 384 F. Supp.

3d 254, 277 (E.D.N.Y. 2019) (citing *Zambrano v. Strategic Delivery Solutions, LLC*, No. 15-CV-8410 IER), 2016 WL 5339552, at *10 (S.D.N.Y. Sept. 22, 2016)).  In this case, all of Plaintiffs' claims are subject to binding arbitration, and therefore, retaining jurisdiction over them would serve no purpose.  As such, Defendants request that Plaintiffs' claims be dismissed in favor of the arbitration forum selected by the parties to this dispute.

### IV.    Conclusion

Defendants respectfully request that the Court dismiss this lawsuit and compel individual arbitration of all of Plaintiffs' claims pursuant to the Arbitration Agreements they signed – and their counsel previously blessed before this Court.  Defendants also pray for such other and further relief to which they may be entitled.

Dated this the 18th day of September, 2019.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.

/s/John G. Stretton
John G. Stretton (CT 19902)
john.stretton@ogletree.com
Kelly M. Cardin (CT 29162)
kelly.cardin@ogletree.com
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
281 Tresser Boulevard, Suite 602
Stamford, CT 06901
Tel.: 203-969-3100
Fax: 203-969-3150

Margaret S. Hanrahan (NC Bar No. 52927)*
maggie.hanrahan@ogletree.com
Benjamin R. Holland (NC Bar No. 28580)*
benjamin.holland@ogletree.com
Elizabeth R. Gift (NC Bar No. 44331)*
elizabeth.gift@ogletree.com
*Admitted Pro Hac Vice
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
201 S. College Street, Suite 2300
Charlotte, North Carolina 28244
Tel.: 704-342-2588
Fax: 704-342-4379

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION** with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following:

Harold L. Lichten
Matthew W. Thomson
Zachary L. Rubin
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
(617) 994-5800
hlichten@llrlaw.com
mthompson@llrlaw.com
zrubin@llrlaw.com

Dated this the 18th day of September, 2019.

/s/John G. Stretton
John G. Stretton